# State of Vermont v. Phillip Savva

[616 A.2d 774]

No. 90-035

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed October 25, 1991

Motion for Reargument Granted December 4, 1991

Opinion on Reargument Filed August 14, 1992

*Reversed.*

Dan M. Davis, Windham County State's Attorney, and *Karen R. Carroll*, Deputy State's Attorney (On the Brief), Brattleboro, for Plaintiff-Appellee.

*E.M. Allen*, Defender General, *David Williams*, Appellate Attorney, and *Robert Melvin*, Law Clerk (On the Brief), Montpelier, for Defendant-Appellant.

**Morse, J.** The sole issue on appeal is the legality under Article 11 of the Vermont Constitution of a warrantless search for and seizure of marijuana in an automobile stopped for speeding. Because the contraband found in the car's hatchback area should have been suppressed, we reverse defendant's conviction for possession of more than two ounces of marijuana.

In the late afternoon of November 11, 1985, a Vermont State Police trooper, Lionel Shapiro, spotted a speeding Subaru, pursued it, determined it was travelling at speeds of 80 to 85 miles per hour, and stopped it. Defendant was driving and his five-year-old daughter was seated next to him.

As Shapiro approached the Subaru's rolled-down window, he smelled what he believed was marijuana. Shapiro said nothing

about that observation and processed defendant for speeding, writing out the ticket in his cruiser as defendant remained in his car. When Shapiro returned to hand defendant the ticket, he again smelled the odor and noticed defendant's eyes appeared red and glassy. The trooper asked defendant if he had been smoking marijuana. Defendant said he had not and declined the trooper's request to "look in" the car. Shapiro then ordered defendant out of his car and began searching it for the source of the odor, while defendant stood in front of the Subaru.

Shapiro first came upon a paper bag containing a small amount of marijuana and rolling papers in a small, open compartment in the driver's door. Defendant was then patted down and placed under arrest. The trooper called for assistance. While still standing in front of his car, defendant indicated he was cold and wanted his jacket, which was in the backseat. As defendant "lunged" toward the door, Shapiro stopped him and removed the jacket himself, checked the pockets and found a large amount of cash and newspaper clippings. Defendant was patted down again and given the jacket. The cash amounted to about $10,000; the clippings described Coast Guard drug surveillance and the cocaine situation in Bolivia.

Another trooper, David Tetrault, arrived at the scene. He put defendant and defendant's daughter in the backseat of his cruiser. Meanwhile, Shapiro continued his search of the Subaru. Two marijuana roaches were found in the frontseat ashtray and one in the backseat ashtray. In an unlocked briefcase on the backseat, Shapiro found more newspaper clippings about drug trafficking, "smuggler belts," a calculator, and assorted papers. He also found in the backseat area duffel bags with clothing in them and a locked suitcase. As he searched the interior, Shapiro continued to smell a strong odor of marijuana. At this point, further back-up assistance was requested.

Shapiro next exposed the Subaru's hatchback area by unlatching an unlocked vinyl cover from inside the vehicle's backseat. In the hatchback, Shapiro found a closed brown paper bag. He opened it and discovered seven plastic zip-lock bags each filled with about one-quarter pound of marijuana, a brown plastic bag containing marijuana, and a white plastic bag containing a clear plastic bag filled with hash tar. A slide viewer and photographic slides of tropical areas were also found.

Two more officers then arrived at the scene, and defendant was told he was under arrest for felony possession of marijuana. The contraband and other evidence was collected and put in a cruiser. One of the officers stayed with defendant's car, which was towed to police barracks. Defendant and his daughter were taken to the barracks where he was processed. There, the locked suitcase was cut open and $2,000 in cash found. At no time did authorities seek a search warrant.

## I.

The search of defendant's automobile and everything contained there would undoubtedly be permitted under the so-called "automobile exception" to the fourth amendment. Originally created to address the impracticality of getting a warrant to search a mobile vehicle on the road, see *Carroll v. United States*, 267 U.S. 132, 153 (1925), the automobile exception over its sixty-six year history has been expanded beyond the initial rationale of exigent circumstances. The exception is not limited to the automobile itself, but includes the contents of all containers found anywhere in the vehicle that might contain the object of the search. Probable cause is required, but a warrant is not. *California v. Acevedo*, — U.S. —, —, 111 S. Ct. 1982, 1991 (1991) (*Carroll* allows warrantless searches of containers within vehicles even if police have probable cause to search only the container but not the vehicle); *United States v. Ross*, 456 U.S. 798, 825 (1982) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."). The *Ross/Acevedo* rule places motor vehicles and their contents outside the warrant protection of the fourth amendment even if exigent circumstances do not exist. Thus, once Officer Shapiro developed probable cause that defendant's car contained marijuana—and in deciding this case we assume he did—he was entitled to search the hatchback and open all packages that might contain the drug.

The automobile exception was first articulated in *Carroll*, 267 U.S. at 153, a prohibition-era case, where the Court used it to justify a warrantless search for bootleg liquor in the upholstered seats of an automobile. Distinguishing searches of motor vehicles from those of stationary structures, the Court held

that securing a warrant was not practical "because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." *Id.*

Exigent circumstances are usually recognized as a reason to except a search from the warrant requirement only in cases where delay in procuring a warrant would put police officers or others in danger or would result in the removal or destruction of evidence. See, e.g., *Arkansas v. Sanders*, 442 U.S. 753, 759 (1979). In these "carefully delineated" exceptions, the state bears the burden of showing that circumstances require that they forego the warrant process. *Id.* at 760.

But in the automobile search line of cases, whether mobility in fact creates an exigent circumstance has become irrelevant; mobility is an exigent circumstance as a matter of law. See *Ross*, 456 U.S. at 806–07 ("the nature of an automobile in transit" is the basis of a per se rule that "a warrantless search of an automobile is not unreasonable"); *California v. Carney*, 471 U.S. 386, 392–93 (1985) (warrantless search of motor home reasonable because it is "readily mobile"); *Chambers v. Maroney*, 399 U.S. 42, 50–52 (1970) (taking car to police station and searching it without a warrant was reasonable because "the opportunity to search is fleeting since a car is readily movable" even though the car in this case was under secure police control).

*Carroll* was decided before the Court fully developed reasonable-expectation-of-privacy analysis, the cornerstone of fourth amendment jurisprudence. See *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring) (fourth amendment protects privacy where person has expressed an actual subjective expectation of privacy and that expectation is one that society is prepared to recognize as "reasonable"). In its post-*Katz* automobile cases, the Court has nevertheless downplayed the privacy analysis of *Katz*. Instead of a case-by-case analysis of the individual's privacy interest in the object to be searched, the Court has posited a diminished expectation of privacy in motor vehicles to help explain dispensing with the need for a warrant. For example, in *Cardwell v. Lewis*, 417 U.S. 583, 590 (1974), a case in which paint scrapings were taken from a car's *exterior* and its tire treads were compared to a cast made at a crime scene, the Court went beyond the plain view analysis and stated:

One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view.

The diminished expectation of privacy extends even to those parts of the vehicle not in plain view because motor vehicles are subjected to "pervasive and continuing governmental regulation and controls," such as licensing and inspection requirements. *South Dakota v. Opperman*, 428 U.S. 364, 368 (1976); see also *Carney*, 471 U.S. at 391–92; *Cady v. Dombrowski*, 413 U.S. 433, 441–42 (1973).

Even containers found inside a vehicle receive no warrant protection under federal constitutional law. In numerous cases prior to *Ross* and *Acevedo*, the Court had differentiated the expectation of privacy in containers from that of vehicles. In *United States v. Chadwick*, 433 U.S. 1, 13 (1977), Chief Justice Burger, writing for seven members of the Court, stated:

> The factors which diminish the privacy aspects of an automobile do not apply to respondents' footlocker. Luggage contents are not open to public view, except as a condition to a border entry or common carrier travel; nor is luggage subject to regular inspections and official scrutiny on a continuing basis. Unlike an automobile, whose primary function is transportation, luggage is intended as a repository of personal effects. In sum, a person's expectations of privacy in personal luggage are substantially greater than in an automobile.

In *Sanders*, 442 U.S. at 764, Justice Powell concluded that:

> a suitcase taken from an automobile stopped on the highway is not necessarily attended by any lesser expectation of privacy than is associated with luggage taken from other locations. One is not less inclined to place private, personal possessions in a suitcase merely because the suitcase is to be carried in an automobile rather than transported by other means or temporarily checked or stored.

In *Ross* and *Acevedo*, the Court collapsed the distinction between containers and vehicles by dispensing with privacy anal-

ysis. Stating that an individual's "privacy interests in a car's trunk or glove compartment may be no less than those in a movable container," the *Ross* Court gave both containers and closed portion of the vehicle the same diminished expectation of privacy previously allotted to that part of a vehicle in plain view. 456 U.S. at 823. Under this approach, if the police develop probable cause that something they seek is located in an automobile, they can treat all parts of the automobile and all containers within—those exposed to public view and those hidden, open and closed, locked and unlocked—the same. *Acevedo*, — U.S. at —, 111 S. Ct. at 1991 (no difference between searching a motor vehicle and searching a container found inside, even if police had probable cause to search only the container and not the vehicle).

We view the Court's references to a diminished expectation of privacy as makeweight to an underlying "exigency" rationale. In a particular case, the reasonable-expectation-of-privacy test is either met, thereby triggering fourth amendment protection, or it is not met and the amendment does not apply. In *Oliver v. United States*, 466 U.S. 170, 179 (1984), the Court held that a subjective expectation of privacy in lands outside the curtilage, so-called "open fields," is objectively unreasonable. Consequently, the fourth amendment does not apply in any respect to open fields, and they may be searched without a warrant or probable cause. If the Court seriously doubts that an expectation of privacy in a container found in an automobile is objectively reasonable, then the fourth amendment would not be triggered at all and not even probable cause would be required to search one.

The expansion of the automobile exception to include containers found within the vehicle has been the subject of much scholarly criticism. See Katz, *The Automobile Exception Transformed: The Rise of a Public Place Exemption to the Warrant Requirement*, 36 Case W. Res. 375, 407–08 (1986) (by substituting impracticality rationale for privacy analysis, Court has betrayed fundamental fourth-amendment principles, in particular, its "own principle that the initial intrusion and the scope of a search are not the same and must be justified on separate grounds"); Gardner, *Searches and Seizures of Automobiles and their Contents: Fourth Amendment Considera-*

*tions in a Post-*Ross *World,* 62 Neb. L. Rev. 1, 35 (1983) (*Ross* "appears to have created a new probable cause exemption to the warrant rule without providing satisfactory justification for abandoning the preference for warrants"); *The Supreme Court, 1981 Term,* 96 Harv. L. Rev. 62, 184–85 (1982) (Court's concept of diminished expectation of privacy does not effectively distinguish between vehicles and containers; in service of efficiency goals, Court applies an "arbitrary approach to privacy expectations"); see also 3 W. LaFave, Search and Seizure § 7.2(d), at 56 (2d ed. 1987) (*Ross* raises "fundamental questions" about the warrant requirement, including whether police convenience should ever be sufficient rationale for dispensing with it).

The opinion was also the subject of a persuasive dissent by Justice Marshall, who wrote that the Court had "not only repeal[ed] all realistic limits on warrantless automobile searches, it repeal[ed] the Fourth Amendment warrant requirement itself." *Ross,* 456 U.S. at 827. In Marshall's view, the automobile exception swallowed the rule. Although warrantless automobile searches arguably could be justified by the inherent mobility of vehicles, searches of containers found inside vehicles, which could easily be seized and brought before a magistrate, could not be so justified. *Id.* at 831–32. Although people may have a lesser expectation of privacy in their vehicles, which are exposed at least in part to the public eye, that lesser expectation does not automatically carry over to the contents of containers, which can be closed, sealed, and themselves concealed from public view. *Id.* at 832. Marshall suggested that expediency, specifically the Court's desire to assist police in conducting automobile searches, motivated its expansion of the automobile exception:

> "When a legitimate search is under way," the Court instructs us, "nice distinctions between . . . glove compartments, upholstered seats, trunks, and wrapped packages . . . must give way to the interest in the prompt and efficient completion of the task at hand."

*Id.* at 842 (quoting the Court's opinion, *id.* at 821). The Court's conclusion is an ironic twist in fourth amendment jurisprudence; it has long been established that the "mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment." *Mincey v. Ari-*

*zona,* 437 U.S. 385, 393 (1978); see also *Coolidge v. New Hampshire,* 403 U.S. 443, 481 (1971) (warrant requirement "has been a valued part of our constitutional law for decades . . . It is not an inconvenience to be somehow 'weighed' against the claims of police efficiency."); *Johnson v. United States,* 333 U.S. 10, 15 (1948) ("inconvenience to the officers and some slight delay necessary to prepare papers and present the evidence to a magistrate . . . are never very convincing reasons and . . . certainly are not enough to by-pass the constitutional [warrant] requirement").

The Court recently acknowledged the criticism by the academic legal community that it had developed two inconsistent lines of containers-in-cars jurisprudence—one creating an expansive warrant exception for automobiles, the other creating a more limited exception for containers. In *Acevedo,* the solution was to apply the more expansive warrant exception for both cars and containers in order to provide "'clear and unequivocal'" guidelines for police officers. — U.S. at —, 111 S. Ct. at 1990 (quoting *Arizona v. Roberson,* 486 U.S. 675, 682 (1988)).

Justice Scalia's concurrence in *Acevedo,* however, offered a candid observation. The container cases effectively overruled by *Acevedo—Chadwick* and *Sanders*—took the "'preference for a warrant' seriously"; the pure automobile exception cases, *Carroll* and *Ross,* did not. — U.S. at —, 111 S. Ct. at 1993.

## II.

■■ The United States Supreme Court's ebbs and flows in this area of criminal constitutional procedure do not predetermine our interpretation of Vermont's search and seizure law under Article 11. We have often noted that our constitution may afford greater protection of individual rights than the federal one does. *State v. Kirchoff,* 156 Vt. 1, 4, 587 A.2d 988, 991 (1991); see also *State v. Badger,* 141 Vt. 430, 449, 450 A.2d 336, 346 (1982). Article 11 provides:

> That the people have a right to hold themselves, their houses, papers, and possessions, free from search or seizure; and therefore warrants, without oath or affirmation first made, affording sufficient foundation for them, and whereby by any officer or messenger may be commanded or required to search suspected places, or to seize any per-

son or persons, his, her or their property, not particularly described, are contrary to that right, and ought not to be granted.

Our task is "to honor not merely the words but the underlying purposes of constitutional guarantees" and "to discover and protect the core value that gave life to Article 11." *Kirchoff*, 156 Vt. at 6, 587 A.2d at 992.

■■ Although warrantless searches are sometimes permitted under Article 11, these exceptions must be "'jealously and carefully drawn.'" *State v. Jewett*, 148 Vt. 324, 328, 532 A.2d 958, 960 (1986) (quoting *State v. Meunier*, 137 Vt. 586, 588, 409 A.2d 583, 584 (1979)). As Justice Stevens emphasized in his *Acevedo* dissent, — U.S. at —, 111 S. Ct. at 1994, the fourth amendment warrant requirement was intended as a restraint on executive power, "a bulwark against police practices that prevail in totalitarian regimes." The warrant requirement is a "sound policy judgment that, absent exceptional circumstances, the decision to invade the privacy of an individual's personal effects should be made by a neutral magistrate rather than an agent of the Executive." *Id.*

■ The abuse of warrants was "so deeply felt by the Colonies as to be one of the potent causes of the Revolution." *United States v. Rabinowitz*, 339 U.S. 56, 69 (1950) (Frankfurter, J., dissenting); see also Justice Frankfurter's dissents in *Davis v. United States*, 328 U.S. 582, 603–05 (1946), and *Harris v. United States*, 331 U.S. 145, 157–62 (1947), in which he details the colonial warrant abuses and the development of search and seizure provisions in the early state constitutions, predating the federal constitution. The preference for judicially issued warrants reflects a "'basic constitutional doctrine that individual freedoms will best be preserved through a separation of powers and division of functions among the different branches and levels of Government.'" *Sanders*, 442 U.S. at 759 (quoting *United States v. United States District Court*, 407 U.S. 297, 317 (1972)).

Thus, as a matter of constitutional policy, a warrant requirement is not a starting point for deriving exceptions that balance citizens' interest in privacy against law enforcement's interest in expeditious searches. Rather, it *is* the balance reached by the

constitutional drafters, a balance in which the individual's interest in privacy outweighs the burdens imposed on law enforcement, such that those subjected to searches must be "protected by advance judicial approval." See *Harris*, 331 U.S. at 162 (Frankfurter, J., dissenting) (we cannot look at individual searches or seizures to determine if they are "reasonable"; rather, the fourth amendment drafters determined what is reasonable based on historical experience, and "with minor and severely confined exceptions, inferentially a part of the Amendment, every search and seizure is unreasonable when made without a magistrate's authority expressed through a validly issued warrant").

This position was adopted by the Court in *Katz*, 389 U.S. at 357 (searches conducted without prior judicial approval "are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions"). We have taken this "basic constitutional rule" as our own. *State v. Meunier*, 137 Vt. at 588, 409 A.2d at 584. In dealing with the difficult problem of automobile searches, we do not believe this principle can be sacrificed for the sake of law enforcement convenience.

■ At issue, then, is not whether police officers are more or less skilled decision-makers about when and what to search. Rather, the issue is what branch of government should routinely be making these decisions. The warrant requirement favors decisionmaking by the judicial branch, "a neutral and detached magistrate," rather than by the executive branch, "the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. at 14. Government accountability fostered by Article 11 requires no less.

Although criminal defendants may seek court review of searches and seizures, these after-the-fact challenges do not serve Article 11's purpose of protecting the rights of everyone—law-abiding as well as criminal—by involving judicial oversight before would-be invasions of privacy. In many cases, the magistrate will agree with the necessity for a search, but to focus on those cases is to miss the point. People will be spared ill-considered searches or at least given an impartial objective assessment before a search is carried out. See *Ross*, 456 U.S. at

829 (Marshall, J., dissenting) (warrant requirement "prevents some overbroad or unjustified searches from occurring at all").

The warrant requirement brings a significant check on law enforcement conduct, because not just fruitful searches will be on the record, and searches on doubtful grounds may not be attempted at all if authorities know they must first go before a judicial officer.

Looking at the impact on society as a whole, the social costs of eliminating the warrant requirement are simply too high. Without it, police behavior would be subjected to judicial scrutiny only in rare cases, while "[d]ay by day mischief may be done and precedents built up in practice long before the judiciary has an opportunity to intervene." *Harris*, 331 U.S. at 173.

Another benefit of the warrant requirement is that prior review prevents "'hindsight from coloring the evaluation of the reasonableness of a search or seizure.'" *Ross*, 456 U.S. at 829 (Marshall, J., dissenting) (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 565 (1976)). Even if the magistrate reaches the same probable cause conclusion as the police, participation of a neutral decisionmaker "reassures the public that the orderly process of law has been respected." *Id.*

■ We are convinced that the warrant requirement is and must remain a central part of Article 11. See *Records of the Council of Censors* 205–06 (1991) (in 1813, finding a statute providing that persons travelling through the state in "suspicious circumstances" were liable to have their trunks opened and searched without a warrant "repugnant" under Article 11, the Fifth Council of Censors recommended its immediate repeal). Any exceptions to the warrrant requirement must be factually and narrowly tied to exigent circumstances and reasonable expectations of privacy. We reject the bright-line tests of *Ross* and *Acevedo* here, as we rejected the bright-line test of *Oliver* in *Kirchoff*, 156 Vt. at 10, 587 A.2d at 995, because these tests fail "to do justice to the values underlying Article 11."

■ We have previously identified freedom from unreasonable government intrusions into legitimate expectations of privacy as a core value protected by Article 11 jurisprudence. *Id.* at 6, 587 A.2d at 992. Our analysis must be grounded on defendant's expectation of privacy in the packages contained in the

hatchback of his vehicle. We agree with the Supreme Court's reasoning in *Sanders*, 442 U.S. at 764–65, and *Chadwick*, 433 U.S. at 13, and will recognize a separate and higher expectation of privacy for containers used to transport personal possessions than for objects exposed to plain view within an automobile's interior.

## III.

▆▆▆▆ Privacy analysis, however, does not end the matter. We have previously held that Article 11 prohibits only "unreasonable" searches and seizures. *State v. Platt*, 154 Vt. 179, 183, 574 A.2d 789, 791 (1990). An otherwise unreasonable warrantless search may be justified by exigent circumstances. See *State v. Badger*, 141 Vt. at 455, 450 A.2d at 350 (police seizure of "manifestly incriminating, yet vulnerable, evidence" reasonable under Article 11). A container found within a vehicle may be mobile, capable of being carried away. But a container that can be seized, removed from the vehicle, and secured by the police does not ordinarily present a reasonable exigent circumstance to dispense with a warrant to search the container.

We agree with Justice Harlan, who, dissenting in *Chambers*, tied the limited scope of warrantless searches to the warrant requirement:

> The Court has long read the Fourth Amendment's proscription of "unreasonable" searches as imposing a general principle that a search without a warrant is not justified by the mere knowledge by the searching officers of facts showing probable cause. The "general requirement that a search warrant be obtained" is basic to the Amendment's protection of privacy, and "'the burden is on those seeking [an] exemption . . . to show the need 'for it.'"
>
> Fidelity to this established principle requires that, where exceptions are made to accommodate the exigencies of particular situations, those exceptions be no broader than necessitated by the circumstances presented.

399 U.S. at 61 (citations omitted).

▆▆▆▆ Finally, in our prior cases on exigent circumstances, we have demanded that, when acting without a warrant, police operate "in the least intrusive manner possible under the circum-

stances." *Platt*, 154 Vt. at 188, 574 A.2d at 794; see also *Badger*, 141 Vt. at 455, 450 A.2d at 350 (approving warrantless seizure as "the least restrictive method" of obtaining evidence). Article 11 protects two kinds of rights: possessory rights, which are implicated in police seizures, and privacy rights, which are implicated in searches. *Platt*, 154 Vt. at 188, 574 A.2d at 794. In *Platt*, we held that seizing defendant's car and holding it pending a search warrant was reasonable. Yet, we decline to hold as a matter of law that a warrantless search will always be more intrusive than a warrantless seizure, because there may be circumstances when a possessory interest may outweigh a privacy interest.

## IV.

Defendant was convicted of felony possession of marijuana, 18 V.S.A. § 4224(f)(1)(B), based on the evidence of the drugs found in plastic bags in the hatchback of his vehicle. Assuming without deciding that Officer Shapiro had probable cause to search the hatchback for the drugs, we must decide whether the search he conducted, opening the bags and examining their contents, was a permitted exception to the warrant requirement.

We begin with an analysis of whether defendant had a reasonable expectation of privacy, not in the vehicle as a whole, but specifically in the contents of the brown paper bag in which the drugs, contained in plastic bags, were found. Article 11 does not protect areas willingly exposed to the public, *Kirchoff*, 156 Vt. at 7, 587 A.2d at 993, but instead requires an "objective" inquiry into whether a reasonable person would know that someone placing articles as defendant did intended to exclude them from public view, see *id.* at 10, 587 A.2d at 994.

Functionally, the bag was a closed container. Although it could not be locked, it nonetheless effectively concealed its contents from the public eye. Officer Shapiro had to open it to see the separate plastic bags inside. These bags too were opaque and concealed their contents. Nor was the packaging so distinctive as to give away the contents; all kinds of possessions—clothing, groceries, garbage—are carried in paper and plastic bags.

We refrain from adopting the hairsplitting analysis of the "unworthy container" doctrine, which gives privacy protection

to suitcases but not to paper bags. See *Robbins v. California*, 453 U.S. 420, 434 n.3 (1981) (Powell, J., concurring). This doctrine has been rejected by the United States Supreme Court. *Ross*, 456 U.S. at 822 (fourth amendment forecloses distinction between "worthy" and "unworthy" containers; "a traveler who carries a toothbrush and a few articles of clothing in a paper bag . . . claim[s] an equal right to conceal his possessions from official inspection as the sophisticated executive with the locked attache case"). On the other hand, if a container discloses its contents either because it is open ("plain view") or its configuration gives away what is inside (e.g., a pistol in a holster), Article 11's requirement for an expectation of privacy may not be met. *Sanders*, 442 U.S. at 764 n.13. No evidence in this case supports a conclusion that the bag's contents were known as a foregone conclusion before it was opened.

We find that the warrantless search of the bags on the scene was not supported by exigent circumstances because a less intrusive option was available. See *Platt*, 154 Vt. at 188, 574 A.2d at 794. Once Officer Shapiro found the paper bag, he could easily have seized the bag and applied to a magistrate for a warrant before searching it. To protect defendant's possessory interest in the bag, the officer could have offered defendant the choice of allowing him immediately to inspect the bag's contents. We may believe that the lesser intrusion will almost always be a seizure, but there is no reason to create a per se rule that deprives the person of the choice. In this regard, we adopt the reasoning of Justice Linde, of the Oregon Supreme Court:

> The obvious, and correct, alternative is that the choice [between an immediate search and a temporary seizure while a warrant is sought] belongs to the person whose constitutional interests are at stake. . . .
>
> . . . The person, not the officer, is the one to decide whether to insist on the right to have the supposed probable cause tested by a magistrate and to accept the inconvenience of the necessary seizure. There simply is no basis for this court or any court to make such a categorical choice for all owners of . . . closed containers found in automobiles as a class.

*State v. Brown*, 301 Or. 268, 294–95, 721 P.2d 1357, 1373 (1986) (dissenting). If the person requests a warrant, then exigent cir-

cumstances may well exist to justify the seizure that did not exist to justify the search. *Id.*

We emphasize that our conclusion is specific to the facts of this case. There may be situations in which a driver's possessory interests may be stronger than privacy interests; the driver may even prefer an expeditious search to a prolonged seizure. Alternatively, there may be true exigent circumstances requiring an immediate search. Mobility, however, is not per se an exigent circumstance, and the burden is on the government to show that evidence might be lost before a warrant could be obtained. See *State v. Ritte*, 68 Haw. 253, 257, 710 P.2d 1197, 1201 (1985) ("To establish exigent circumstances . . . government must show it had reason to believe that because of the vehicle's mobility or exposure, there was a foreseeable risk that it might be moved or that the evidence which it contained might be lost before a warrant could be obtained.").

In short, a legitimate expectation of privacy was implicated here, and the State failed to prove that getting a warrant to search the contents of the packages found in the hatchback was unreasonable because of undue risk to the evidence-gathering process or public safety. *Kirchoff*, 156 Vt. at 13, 587 A.2d at 996 (State has burden of proving a warrantless search is not prohibited).

The search of the Subaru itself, its interior and the hatchback, is not addressed because the invalid search of the bags found in the hatchback area requires suppression of the marijuana seized and identified as the basis for the charge and conviction: without that contraband as evidence, the conviction must be reversed.

The rationale found in *New York v. Belton*, 453 U.S. 454, 462–63 (1981) ("search incident to arrest" exception to warrant requirement applies to containers found in car passenger compartment), has no bearing on the search of the bag found in the hatchback. The trial court found as a factual matter that the hatchback was not part of the passenger compartment of defendant's vehicle.

V.

How often we hear the clamor of the moment that Article 11 is used as a barrier to effective law enforcement, and how often

people forget that Article 11 is the balance struck between liberty for the individual (privacy and a sense of security) and the convenience of unchecked crime detection. That balance requires authorities to have good cause to invade privacy and to filter decisions through a judicial process. When legitimate exigencies make the judicial process impractical (not merely inconvenient), common sense dictates reasonable accommodations. But the exigencies and assessment of what sense of privacy is at stake must be real, not legal figments or fictions designed to mask the values and purposes of Article 11.

Justice Frankfurter, writing in 1947 about the warrant requirement with an eye to the broader historical lessons taught by two recent world wars, emphasized

> what is involved far transcends the fate of some sordid offender. Nothing less is involved than that which makes for an atmosphere of freedom as against a feeling of fear and repression for society as a whole. The dangers are not fanciful. We too readily forget them.

*Harris*, 331 U.S. at 173 (dissenting).

*Reversed.*

## On Motion for Reargument

Defendant's conviction for felony possession of marijuana was reversed because the drugs used as evidence (several pounds of marijuana and hash tar) were found during a warrantless search of packages in the hatchback of his vehicle and should have been suppressed. The State's motion to reargue asks this Court to remand for a new trial on the lesser-included offense of misdemeanor possession of marijuana, based on the discovery of small amounts of marijuana found in the passenger area of defendant's vehicle before the search of the hatchback.

Defendant was originally charged with one count of possession of marijuana in an amount two ounces or greater, 18 V.S.A. § 4224(f)(1)(B), and one count of possession of marijuana with intent to sell, 18 V.S.A. § 4224(e). The second charge was dropped, and the trial proceeded on the first charge. At trial, the State introduced evidence of marijuana found in the hatchback. It also introduced a paper bag found in the door compartment, which contained .1 gram (about a thimbleful) of

marijuana and entered testimony concerning, but no physical evidence of, roaches found in the vehicle's ashtray.

The State never charged defendant with simple possession of marijuana in any amount, 18 V.S.A. § 4224(a), nor did it argue for conviction on that crime. At defendant's request, the trial court instructed the jury that it could convict defendant on misdemeanor possession, based on his theory that the jury might believe that he knew nothing of the drugs in the hatchback but still convict him for possession of the marijuana in the passenger compartment.

We need not decide whether the State may retry a defendant on a lesser-included offense after reversal of a conviction for a greater offense because in this case misdemeanor possession of marijuana was not a lesser-included offense. Rather, misdemeanor possession of the small stash in the passenger compartment was a separate and distinct offense from felony possession of the much larger amount found in the hatchback. See *State v. Gooden*, 133 N.H. 674, 679, 582 A.2d 607, 610 (1990) (separate and distinct evidence supported one conviction for possession of cocaine and one conviction for possession of cocaine with intent to sell, even though the two offenses arose out of the same transaction and evidence of both offenses was found in the same location).

"An offense is a lesser-included offense of another if it is composed of some, but not all, elements of the greater offense and does not have any element not included in the greater offense." *State v. Forbes*, 147 Vt. 612, 616–17, 523 A.2d 1232, 1235 (1987) (citing *Blockburger v. United States*, 284 U.S. 299, 304 (1932)). The same act may constitute two separate crimes, and if one is not the lesser-included offense of the second, prosecution may be had for each offense. *Id.* at 617, 523 A.2d at 1235. But merely because the same defendant commits two separate acts, one of which has all the elements of a lesser-included offense of the other, does not mean that it can be charged as a lesser-included offense.

The proceedings below focused on the drugs found in the hatchback. Under defendant's last-minute theory, possession of marijuana found in the passenger compartment was a separate crime, a crime that was never charged and which the

trial court improperly instructed as a lesser-included offense. The State cannot now prosecute defendant for misdemeanor possession of marijuana, see 13 V.S.A. § 4501(d) (statute of limitations for misdemeanors is three years), so remanding this case to the trial court would serve no purpose.

*The Court's decision and its original entry of reversed remain unchanged.*

**Allen, C.J.**, dissenting. I dissent because I conclude that misdemeanor possession of marijuana in this case is a lesser-included offense of felony possession, not a separate offense. A defendant is entitled to a lesser-included offense instruction "if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." *Keeble v. United States*, 412 U.S. 205, 208 (1973). Defendant's theory, that he knew nothing of the drugs found in the rear of the car, raised a question of fact for the jury to resolve. The jury could rationally have believed defendant's theory and found him guilty of misdemeanor possession while acquitting him of felony possession. I therefore cannot agree with the majority's unsupported assertion that the trial court improperly instructed the jury on the lesser-included offense.

The majority concludes that defendant's possession of the smaller amount of marijuana constituted a separate and distinct offense because separate evidence could have supported separate charges. However, this reasoning misapplies the test for determining a lesser included-offense. If "there is any reasonable theory from the evidence which would support [defendant's] position," then a trial court must instruct the jury on the lesser-included offense. *Ex parte Kerr*, 474 So. 2d 145, 146 (Ala. 1985) (it is reversible error not to instruct a jury on the lesser-included offense of simple possession when defendant denies knowledge of the evidence supporting only the greater offense).

The State and defendant argue that the cause should be remanded and I would grant the request.

I am authorized to say that Justice Dooley joins with me in this dissent.